UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLAIR MILLS,

        Plaintiff(s),

v.

DAVE HALL and CITY OF CROSWELL,

        Defendant(s).

_____/

Case No. 06-15689

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [13]**

Plaintiff Clair Mills filed this action under 42 U.S.C. § 1983 and alleges that
Defendants Dave Hall and the City of Croswell violated his rights under the First, Fourth,
and Fourteenth Amendments to the United States Constitution.[1]  Defendants argue that
Plaintiff has failed to establish that his constitutional rights were violated and that, in any
event, Defendant Hall is entitled to qualified immunity and Defendant City cannot be held
vicariously liable.  This matter comes before the Court on Defendants' motion for summary
judgment.  For the reasons set forth below, Defendants' motion is GRANTED.

**I.     Facts**

This case proves the adage that no good deed goes unpunished.  Plaintiff went to the
Croswell flea market, which is located at the Croswell Stockyards, on July 31, 2006, an

_____

[1]Plaintiff's initial complaint also asserted claims against two John Doe defendants.
These defendants were dismissed in the Court's order of January 8, 2008.  (Docket Text
# 21.)  Plaintiff filed an amended complaint on January 15, 2008, that asserts claims only
against Dave Hall and the City of Croswell.  (Docket Text # 23.)

unusually hot day.  (Defs.' Mot. at 1; Pl.'s Resp. at 1.)  Plaintiff spoke with Rex McCorkle, whom he had known for a number of years.  (Pl.'s Resp. at 2.)  Mr. McCorkle submitted an affidavit in which he states that "although [Plaintiff] was perspiring and walking slowly, he seemed to be acting very normally, and he was very mentally competent and alert."  (Pl.'s Resp., Ex. 2 at ¶ 3.)

At approximately 11:50 a.m., Sanilac County Central Dispatch received a report that an individual at the Croswell Stockyards may have been suffering from heat stroke or heat exhaustion, and requested that Croswell EMS respond to the scene.  (Defs.' Mot. at 1; Pl.'s Resp. at 2.)  At the Croswell police station, Croswell Police Officer Brenda Krumenaker heard the dispatch and responded to the Stockyards to assist EMS.  (*Id.*)

Officer Krumenaker arrived at the scene before EMS.  (Defs.' Mot. at 1.)  When she arrived, an off-duty police officer directed her to Plaintiff.  (*Id.*)  Officer Krumenaker testified that Plaintiff "was staggering, sweating profusely and his color was very gray."  (Defs.' Mot., Ex. 3 at 9.)  Officer Krumenaker asked Plaintiff if he was okay, and he told her "to get away from him and leave him the hell alone, he was fine."  (*Id.* at 10.)  Officer Krumenaker offered to let Plaintiff sit in her patrol car to cool off until EMS arrived.  (*Id.* at 11.)  Plaintiff accepted, and Officer Krumenaker assisted him to her car.  (*Id.*)  When they reached the car, Officer Krumenaker opened the back door.  Plaintiff objected to sitting in the back seat, so Officer Krumenaker opened the front passenger door and removed her duty bag from the seat.  (*Id.* at 12.)  Plaintiff asked Officer Krumenaker to take him to his car.  (*Id.*)  She responded that EMS was on the way, and Plaintiff stated that he didn't need EMS.  (*Id.* at 13.)

At this point, two EMS officers arrived on the scene, Paramedic Lyle Bialk and EMT Specialist Patricia Dawson. (Defs.' Mot. at 2; Pl.'s Resp. at 2.) Paramedic Bialk was the licensed medical services provider with the most training specific to the provision of emergency medical care and, as such, assumed authority for the management of Plaintiff's medical treatment.[2] (Defs.' Mot., Ex. 5 at ¶ 6.) Paramedic Bialk testified that Plaintiff looked quite shaky, was sweating profusely, and was very pale. (Defs.' Mot., Ex. 6 at 12.) Paramedic Bialk also testified that Officer Krumenaker was trying to convince Plaintiff to go with EMS into the ambulance; Plaintiff refused and stated that he wanted to go to his car. (*Id.* at 13-14.) At that point, Plaintiff sat down in the patrol car. (*Id.* at 15.)

According to Paramedic Bialk, Plaintiff "refused to exit the car and enter our ambulance so that I could further assess and examine him and render possible treatment if necessary." (Defs.' Mot., Ex. 5 at ¶ 8.) Additionally, Paramedic Bialk initially "suspected that [Plaintiff] was suffering from heat exhaustion or possibly heat stroke and that he needed to be further evaluated and cooled down inside the ambulance." (*Id.* at ¶ 9.) Specialist Dawson knew Plaintiff and believed that he seemed "out of character." (Defs.' Mot., Ex. 8 at 18.) She also testified that he seemed confused and did not recognize her. (*Id.*) For his part, Plaintiff states that he did recognize her but did not address her because "she wasn't in authority." (Defs.' Mot., Ex. 9 at 126.)

At this point, Officer Krumenaker radioed dispatch and asked for Defendant Hall to respond to the scene. (Defs.' Mot. at 2; Pl.'s Resp. at 3.) Defendant Hall arrived on the

---

[2]Michigan law provides: "Authority for the management of a patient in an emergency is vested in the licensed health professional or licensed emergency medical services personnel at the scene of the emergency who has the most training specific to the provision of emergency medical care." Mich. Comp. Laws § 333.20967(a).

scene shortly thereafter. Paramedic Bialk stated that they were trying to convince Plaintiff to get into the ambulance so that he could be evaluated. (Defs.' Mot., Ex. 6 at 18.) Defendant Hall testified that he asked Plaintiff how he was doing and if he needed help. (Defs.' Mot., Ex. 4 at 23.) He also told Plaintiff that they were concerned for his health and wanted to make sure he was okay. (*Id.*) Defendant Hall asked Paramedic Bialk if Plaintiff needed to go to the hospital, and Paramedic Bialk replied, "well, we can't leave him here like this." (Defs.' Mot., Ex. 4 at 24; Ex. 6 at 22.) Defendant Hall tried to convince Plaintiff to exit the car, but Plaintiff refused. (Defs.' Mot., Ex. 4 at 24.) Plaintiff states that Defendant Hall told him, "you are going to get in the ambulance." (Pl.'s Resp., Ex. 9 at 109.)

According to Defendant Hall, Plaintiff tried to close the door to the patrol car at that point, but couldn't as Defendant Hall was in the way. (Defs.' Mot., Ex. 4 at 25.) Defendant Hall once again asked Plaintiff to get out of the car, and Plaintiff responded by grabbing the car's spotlight with his right hand and grabbing the seat with his left hand. (*Id.*) The parties agree about what happened next. Defendant Hall grabbed Plaintiff's wrist and arm in an effort to pull him out of the car. (*Id.*; Pl.'s Resp., Ex. 9 at 119.) Defendant Hall lost his grip because Plaintiff's hands were slippery from sweat. (*Id.*) Defendant Hall grabbed Plaintiff's hand again, and reached over Plaintiff's shoulder with his other arm. (Defs.' Mot., Ex. 4 at 26; Pl.'s Resp., Ex. 9 at 120.) Defendant Hall grabbed Plaintiff's shirt and tried to pull him out that way, but the shirt ripped. (*Id.*) Plaintiff testified that Defendant Hall also ripped a belt loop off of Plaintiff's pants. (Pl.'s Resp., Ex. 9 at 120.)

Defendant Hall, Paramedic Bialk, and Officer Krumenaker all testified that as he was struggling, Plaintiff swung at Defendant Hall and hit him in the face. (Defs.' Mot., Ex. 3 at

20; Ex. 4 at 26; Ex. 6 at 28.)  Plaintiff denies that he struck Defendant Hall.  (Pl.'s Resp., Ex. 9 at 123.)

Plaintiff eventually was removed from the car and handcuffed, though the parties dispute the events that led to the handcuffing.  Officer Krumenaker and Defendant Hall each testified that Plaintiff was removed from the car and was made to sit down on a stretcher.  (Defs.' Mot., Ex. 3 at 22; Ex. 4 at 27.)  Officer Krumenaker, Paramedic Bialk, and Specialist Dawson began to secure Plaintiff to the stretcher with nylon straps.  (Defs.' Mot., Ex. 3 at 24; Ex. 4 at 27.)  Plaintiff began to undo the straps.  At that point, Defendant Hall decided to handcuff Plaintiff to the stretcher.  (Defs.' Mot., Ex. 3 at 25; Ex. 4 at 27.)  Defendant Hall testified that he handcuffed Plaintiff to prevent him from hitting anybody.  (Defs.' Mot., Ex. 4 at 27.)  Plaintiff told Officer Krumenaker and Defendant Halls that he was going to sue them.  (Defs.' Mot., Ex. 3 at 26; Ex. 4 at 31.)  Plaintiff was then placed in the ambulance.  (Defs.' Mot., Ex. 4 at 29.)

Plaintiff, on the other hand, testified that he was handcuffed almost immediately upon being taken out of the car, before he was placed on the stretcher.  (Pl.'s Resp., Ex. 9 at 121-22.)  Paramedic Bialk also testified that Plaintiff was handcuffed before he reached the stretcher.  (Defs.' Mot., Ex. 6 at 22.)  Plaintiff also claims that Officer Krumenaker asked Defendant Hall if Plaintiff was under arrest, to which Defendant Hall responded, "yes, give me your handcuffs."  (Pl.'s Resp., Ex. 9 at 125.)  Defendant Hall, for his part, testified that Plaintiff was not arrested.  (Defs.' Mot., Ex. 4 at 28.)  Paramedic Bialk also did not believe Plaintiff was under arrest.  (Defs.' Mot., Ex. 6 at 38.)  After that, Plaintiff was put in the ambulance.  (Pl.'s Resp., Ex. 9 at 127.)

Once Plaintiff was in the ambulance, Paramedic Bialk learned that Plaintiff had a history of stroke.  (Defs.' Mot., Ex. 5 at ¶ 12.)  Paramedic Bialk started an I.V. of saline solution on Plaintiff because he was sweating profusely and Paramedic Bialk suspected heat exhaustion or heatstroke.  (Defs.' Mot., Ex. 6 at 25.)  Paramedic Bialk asked Plaintiff the day of the week and the date, and Plaintiff did not respond.  (*Id.* at 26.)  Plaintiff did state his name and where he lived.  (*Id.*)

Plaintiff demonstrated a blood pressure reading of 209/142 in the ambulance, and a subsequent reading measured 232/187.  (Defs.' Mot., Ex. 5 at ¶ 12.)  Based on these readings, Paramedic Bialk believed that Plaintiff "could be leading to a stroke and a life-threatening condition."  (*Id.*)  Despite Plaintiff's objections to treatment and transportation to a hospital, Paramedic Bialk, in the exercise of his professional judgment, determined that Plaintiff's "physical condition and altered state of consciousness rendered him incapable of competently objecting to treatment or transportation to the hospital."[3]  (*Id.* at ¶ 13.)  Paramedic Bialk "made the decision to treat and transport" Plaintiff to the hospital "for further examination and treatment by physicians."  (*Id.* at ¶ 14.)  When Plaintiff arrived at Port Huron Hospital, he was transferred to the care of the Port Huron Hospital Emergency Room staff.  (*Id.* at ¶ 17.)

Plaintiff arrived in the emergency room at approximately 1:05 p.m.  (Defs.' Mot., Ex. 10 at 003.)  His situation was determined to be "urgent," and his temperature was recorded

_____

[3]Pursuant to Michigan law, "if emergency medical services personnel, exercising professional judgment, determine that the individual's condition makes the individual incapable of competently objecting to treatment or transportation, emergency medical services may provide treatment or transportation despite the individual's objection."  Mich. Comp. Laws § 333.20969.

as 100.1 degrees. (*Id.*) Plaintiff's diagnosis was "heat exhaustion resolved." (*Id.* at 002.) He was instructed to "drink plenty of fluids" and "stay in a cool place if possible." (*Id.*) Plaintiff was discharged at approximately 2:00 p.m. (*Id.* at 004.)

Plaintiff filed this action in December 2006. (Docket Text # 1.) The Court dismissed Plaintiff's state law claims in a January 18, 2007 order. (Docket Text # 2.) Plaintiff's remaining claims allege that Defendants violated his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. This matter is now before the Court on Defendant's motion for summary judgment.

## II.    Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.  Analysis

Plaintiff's constitutional claims lie against Defendant Hall and against the City of Croswell.  The Court will consider the claims against each Defendant separately.

### A. Defendant Hall

Plaintiff's claims under 42 U.S.C. § 1983 require him to show "that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001).  There is no question that Defendant Hall was a person acting under color of state law.  The sole remaining issue is whether Defendant Hall deprived Plaintiff of his constitutional rights.

Defendant Hall maintains that he did not violate Plaintiff's constitutional rights and that, in any event, he is entitled to the defense of qualified immunity.  These arguments are intertwined, for the first step in analyzing a qualified immunity defense is to determine whether a constitutional right has been violated.  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005).  If so, the Court then must determine whether that constitutional right was clearly established.  *Id.*

The Court therefore will first address whether Defendant Hall violated Plaintiff's constitutional rights.  Plaintiff asserts that Defendant Hall violated his First, Fourth, and Fourteenth Amendment rights.  The Court will consider each claim in turn.

### 1. Plaintiff's First Amendment Claim

Plaintiff's First Amendment claim centers on Defendant Halls' alleged retaliation after Plaintiff complained to the police and insisted on his right to return to his car. To establish this claim, Plaintiff must show: (1) that he engaged in protected conduct; (2) that Defendant Hall took an adverse action against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that the protected conduct was a "motivating factor" behind Defendant Hall's actions. *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007). The Sixth Circuit realized that the third factor "might lend itself to misunderstanding" and explained that a motivating factor "is one without which the action being challenged simply would not have been taken." *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002). Stated differently, if the same governmental action "would have been taken even in the absence of the protected conduct," the governmental action is not unconstitutional. *Id.* (citing *Mount Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977).

Defendant Hall does not dispute that Plaintiff's complaints to the police are protected speech under the First Amendment. *See, e.g., Barnes v. Wright*, 449 F.3d 709, 717 (6th Cir. 2006) ("there can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment"). Plaintiff therefore has met the first prong of a retaliation claim.

With respect to the second prong, Plaintiff argues that the adverse action occurred when Defendant Hall "subjected him to assault and arrest for no . . . apparent reason." (Pl.'s Resp. at 11.) As discussed below, no reasonable juror could conclude that Plaintiff was arrested. Plaintiff also has failed to present sufficient evidence to establish that he was

assaulted. *See, e.g.*, *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991) ("An assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact.") Nonetheless, Plaintiff has presented sufficient evidence of a battery, which "is the wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.* Plaintiff testified that Defendant Hall grabbed him, ripped off his shirt, and handcuffed him; a reasonable juror could conclude that this "would likely chill a person of ordinary firmness from continuing to engage in that activity." *Leonard*, 477 F.3d at 355.

The question remains whether Defendant Hall's actions "would have been taken even in the absence of the protected conduct." *Greene*, 310 F.3d at 897. Defendant Hall responded to the scene after he was called by one of his officers, Officer Krumenaker, who had heard the dispatch to EMS and proceeded to the scene to assist. When Defendant Hall arrived, he learned of Plaintiff's physical symptoms. Paramedic Bialk told Defendant Hall that they were trying to convince Plaintiff to move to the ambulance so that he could be evaluated; Paramedic Bialk also told Defendant Hall, "we can't leave him here like this." Both parties agree that Defendant Hall tried to convince Plaintiff to exit the patrol car and that Plaintiff refused. At that point, Defendant Hall physically removed Plaintiff from the car, and Plaintiff immediately was placed on a stretcher and taken to the ambulance, where Paramedic Bialk began to evaluate and treat Plaintiff.

Based on these facts, no reasonable juror could conclude that Defendant Hall would not have taken the same actions had Plaintiff not engaged in protected speech; indeed, all

the evidence indicates that Defendant Hall took action in spite of Plaintiff's protests, not because of them. Accordingly, Plaintiff's speech was not a "motivating factor" behind Defendant Hall's actions. Plaintiff therefore cannot establish the third factor of a claim for retaliation. As a result, Defendant Hall's motion for summary judgment is GRANTED with respect to Plaintiff's First Amendment Claim.

### 2. Plaintiff's Fourth Amendment Claims

Plaintiff presents two Fourth Amendment Claims: wrongful arrest and use of excessive force. With respect to the wrongful arrest claim, Plaintiff argues that he was arrested without probable cause. (Pl.'s Resp. at 14.) Defendant Hall argues in the alternative that he never seized Plaintiff (as that term is used in relation to the Fourth Amendment) and that, even if he did, his actions were objectively reasonable and therefore did not violate the Fourth Amendment. (Defs.' Mot. at 7-10.)

The Sixth Circuit very recently addressed a factually similar case and found "no case authority holding that paramedics answering a 911 emergency request for help engage in a Fourth Amendment 'seizure' of the person when restraining the person while trying to render aid." *Peete v. Metro. Gov't*, 486 F.3d 217, 219 (6th Cir. 2007). In *Peete*, the plaintiff's next of kin, Frederico Becerra, had an epileptic seizure. *Id.* His grandmother called 911, and the paramedics who arrived on the scene:

> restrained Becerra by using their bodies to apply weight and pressure to [Becerrra's] head, neck, shoulders, arms, torso and legs in an attempt to prevent the decedent from moving. In a further effort to restrain Becerra and protect themselves, they tied his hands and ankles behind his back and continued to apply pressure to Becerra while he was in a prone position. Defendants did not take any precautions to ensure that Becerra had a clear passage to breathe, and shortly after being restrained in this matter, Becerra died.

*Id* at 220.

The plaintiff in *Peete* filed a number of claims, including excessive force under the Fourth Amendment. *Id.* The *Peete* court first addressed whether a constitutional seizure had occurred and noted that the "various definitions of 'seizure' contained in the precedents connote an intentional interference with a person's liberty by physical force or a show of authority that would cause a reasonable person consciously to submit." *Id.* The court also pointed out that "where the purpose is to render solicited aid in an emergency rather than to enforce the law, punish, deter, or incarcerate, there is no federal case authority creating a constitutional liability for the negligence, deliberate indifference, and incompetence alleged in the instant case." *Id.* at 221.

The *Peete* court distinguished its prior holding in *Champion v. Outlook Nashville*, 380 F.3d 893 (6th Cir. 2004). In that case, the police were summoned to a parking lot after an autistic man became agitated and violent with his caregiver. *Id.* at 896. The police pepper-sprayed the man, attempted to arrest him, and restrained him in a manner similar to the restraint techniques used by the paramedics in *Peete*. *Id.* at 897. The man began to vomit and died shortly thereafter. *Id.* at 897-98. The *Champion* court held that the man's arrest and restraint by the police constituted a clearly established unreasonable seizure under the Fourth Amendment and accordingly concluded that the officers were not entitled to qualified immunity. *Id.* at 901-02.

The *Peete* court held that *Champion* was distinguishable because:

> The paramedics [in *Peete*] did not unreasonably seize [Becerra] for the purpose of interfering with his liberty. They responded to Becerra's grandmother's call that he was experiencing an epileptic seizure and needed medical attention. They were not acting to enforce the law, deter, or incarcerate. They are unlike the police officers in *Champion* who handcuffed

12

and shackled the plaintiff in order to arrest and incapacitate him. The cases are not the same because the paramedics acted in order to provide medical aid to Becerra. They were attempting to help him, although they badly botched the job according to the complaint.

*Peete*, 486 F.3d at 222.

The case before this Court is more similar to *Peete* than to *Champion*. The Court recognizes that the defendants in *Peete* were paramedics, while Defendant Hall is a police officer. Nonetheless, the evidence in this case establishes that Defendant Hall "did not unreasonably seize [Plaintiff] for the purpose of interfering with his liberty. [He] responded to [a]call that [Plaintiff] . . . needed medical attention. [He was] not acting to enforce the law, deter, or incarcerate." *Id.* Here, someone called Croswell EMS and reported that Plaintiff needed help. Officer Krumenaker heard the dispatch and responded to the scene to assist EMS. Officer Krumenaker allowed Plaintiff to cool off in her car until EMS arrived; when EMS did arrive, Officer Krumenaker tried to convince Plaintiff to go with EMS into the ambulance. Paramedic Bialk, who assumed authority for Plaintiff's medical care when he arrived at the scene, "suspected that [Plaintiff] was suffering from heat exhaustion or possibly heat stroke and that he needed to be further evaluated and cooled down inside the ambulance." (Defs.' Mot., Ex. 5 at ¶ 8, 9.)

When Plaintiff continued to refuse to go to the ambulance, Defendant Hall was called to the scene. Paramedic Bialk told Defendant Hall that they were attempting to persuade Plaintiff to get into the ambulance; Defendant Hall asked if Plaintiff needed to go to the hospital, and Paramedic Bialk responded, "well, we can't leave him here like this." At that point, according to Plaintiff's own testimony, Defendant Hall told him, "you are going to get

into the ambulance." Defendant Hall then grabbed hold of Plaintiff and physically removed him from the car. Plaintiff was handcuffed and placed into the ambulance.

Plaintiff's claim that he was arrested is apparently based on the fact that he was handcuffed and on his allegation that Defendant Hall told Officer Krumenaker that Plaintiff was under arrest. As the *Peete* court noted, however, a government actor who restrains an individual while trying to render medical aid does not "seize" the person for purposes of Fourth Amendment analysis. 486 F.3d at 219. And while Plaintiff claims that Defendant Hall stated he was under arrest, Plaintiff never was brought to the police station, never was charged with a crime, and never was required to report to court; instead, he was brought to a hospital, treated, and released. Indeed, the police report describes the incident as a "medical emergency" and the officers' involvement as "assist ambulance." (Defs.' Mot., Ex. 2.) The police report makes no reference to Plaintiff being arrested. Based on the above, no juror reasonably could conclude that Plaintiff was arrested.

Like the paramedics in *Peete*, Defendant Hall "[was] not acting to enforce the law, deter, or incarcerate." *Peete*, 486 F.3d at 222. His sole function was to assist EMS with the medical treatment of Plaintiff. The Court therefore reaches the same conclusion as did the *Peete* court, and rejects Plaintiff's argument that Defendant Hall unlawfully seized Plaintiff in violation of the Fourth Amendment.[4] *See id.*

_____

[4]This case is also distinguishable from *Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006), a case that was discussed in *Peete*. In *Green*, firefighters transported the plaintiff to the hospital over the plaintiff's objections. The court determined that summary judgment was not appropriate on the plaintiff's Fourth Amendment seizure claim because the defendant "never attempted to assess [the plaintiff's] competence" and "could have asked [the plaintiff] a series of simple questions to determine his competence." *Id.* at 83-84. The court therefore concluded that a jury could conclude that "no reasonable officer would have concluded that [the plaintiff] was incompetent to make decisions concerning his treatment."

Plaintiff also has presented an excessive force claim, which apparently arises out of Defendant Hall removing Plaintiff from the car and putting him in handcuffs. Given the Court's conclusion that Defendant Hall did not unlawfully seize Plaintiff, but was merely aiding EMS with medical treatment, this claim is not viable. The Sixth Circuit's recent decision in *Dorsey v. Barber*, 517 F.3d 389 (6th Cir. 2008), makes clear that a Fourth Amendment seizure must occur before an excessive force claim can be established. *Id.* at 401 ("Under the Fourth Amendment, individuals have a right to be free of excessive force *when police make an arrest or seizure.*") (emphasis added); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Determining whether the force *used to effect a particular seizure* is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.") (emphasis added). The text of the Fourth Amendment supports this conclusion, as it states that "[t]he right of the people to be secure in their persons . . . *against unreasonable searches and seizures*, shall not be violated." U.S. Const. amend. IV (emphasis added).

Additionally, as the *Peete* court noted:

> Assuming arguendo that the restraint techniques used by the EMT's were excessive or medically unreasonable, the plaintiff may be entitled to recovery under the state law of negligence, but improper medical treatment by a

---

*Id.* at 84. Here, in contrast, Paramedic Bialk wanted to move Plaintiff to the ambulance so that he could evaluate Plaintiff and provide medical treatment if necessary. Specialist Dawson knew Plaintiff and stated that he seemed confused and out of character. Once Plaintiff was in the ambulance, Paramedic Bialk determined that "Plaintiff's physical condition and altered state of consciousness rendered him incapable of competently objecting to treatment or transportation to the hospital." Thus, the competency decision that was lacking in *Green* and was so central to that court's holding was present in this case. Accordingly, *Green* does not support Plaintiff's Fourth Amendment claim.

government employee, standing alone, does not violate the Fourth or Fourteenth Amendment.

*Id.*

Further, even if Plaintiff had established a Fourth Amendment seizure, his excessive force claim still would fail. Because Plaintiff's excessive force claim arises under the Fourth Amendment, it must be analyzed under that Amendment's "reasonableness" standard. *Graham,* 490 U.S. at 395. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The *Graham* Court continued, "Not every push or shove . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

When Defendant Hall arrived on the scene, Paramedic Bialk told him that they were trying to convince Plaintiff to get into the ambulance so that he could be evaluated. Defendant Hall asked if Plaintiff needed to go to the hospital, and Paramedic Bialk replied, "well, we can't leave him here like this." Plaintiff admits that Defendant Hall asked him to get out of the car and that he refused the request. (Defs.' Mot., Ex. 9 at 121-22.) Plaintiff also corroborates Defendant Hall's testimony regarding what happened next: Defendant Hall reached into the car and grabbed Plaintiff, his hands slipped, and Plaintiff's clothing was torn. (*Id.* at 120; Defs.' Mot., Ex. 4 at 25.)

Defendant Hall was told by the head paramedic on scene that Plaintiff "had been staggering or apparently staggering around the stockyard, people were concerned for his

well-being," and that Plaintiff needed to be evaluated.  (Defs.' Mot., Ex. 6 at 18.)  Further, Plaintiff was sitting in another officer's patrol car and refused to exit the vehicle.  Given these facts, no juror reasonably could conclude that the amount of force used to remove Plaintiff from the car was objectively unreasonable.[5]

Plaintiff's excessive force claim also could be understood to stem from the fact that Plaintiff was handcuffed.  To prevail on this type of claim, Plaintiff must "allege some physical injury from the handcuffing and must show that officers ignored plaintiff's complaints that the handcuffs were too tight," *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (citation omitted), or allege that he was subjected to physical violence after being handcuffed, *see, e.g., McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir. 1988).  Plaintiff has failed to allege any physical injury from the handcuffing; in fact, he admitted that he did not ask the hospital staff to treat his wrists in any fashion.  (Defs.' Mot., Ex. 9 at 158.) Moreover, Plaintiff has presented no evidence that he complained to the officers about the cuffs being too tight.  Finally, Plaintiff has not claimed that he was subject to physical violence after he was handcuffed.  Accordingly, Plaintiff's excessive force claim relating to being handcuffed must fail.

Plaintiff was not seized in violation of the Fourth Amendment, and he was not subjected to excessive force.  Accordingly, Defendant Hall's motion for summary judgment is GRANTED with respect to Plaintiff's Fourth Amendment claims.

---

[5]Defendant Hall's use of force in this case is a far cry from the amount of force used in *Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002), the primary case relied upon by Plaintiff.  In that case, the plaintiff has handcuffed, tackled, hit in the face twice, and his head was banged into the floor at least three times.  Because *Phelps* is so factually distinguishable, it provides no guidance for the disposition of the case before the Court.

### 3. Fourteenth Amendment

Plaintiff's final claim against Defendant Hall arises under the Due Process Clause of the Fourteenth Amendment. This claim is premised upon Defendant Hall's alleged "unprovoked attacks" on Plaintiff. (Pl.'s Resp. at 15.) More specifically, Plaintiff claims that he was "arrest[ed] and/or seize[d] . . . based on his refusal of medical treatment." (*Id.* at 16.) Essentially, then, Plaintiff's Fourteenth Amendment claim can be understood as having two bases: his right to refuse medical treatment, and Defendant Hall's alleged retaliation when Plaintiff exercised that right.

Insofar as Plaintiff's claim relates to Defendant Hall's alleged retaliation, it is properly analyzed under the Fourth Amendment, not under the Fourteenth Amendment. *See, e.g., Graham*, 490 U.S. at 395 (holding that *"all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach*"*) (emphasis original); *Ewolski v. City of Brunswick*, 287 F.3d 492, 507 (6th Cir. 2002) (holding that because the plaintiff "was seized for the purposes of the Fourth Amendment, we therefore analyze the police's actions toward him solely under the objective reasonableness test of the Fourth Amendment").

Moreover, even if Plaintiff's retaliation claim did arise under the Fourteenth Amendment, the facts of this case do not rise to the level of a due process violation. The Supreme Court has held that, for purposes of a due process claim, "the cognizable level of executive abuse of power [is] that which shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The Court further explained:

18

we have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. . . . We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.

*Id.* at 848-49.

"In situations wherein the implicated state . . . agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action . . . their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). Plaintiff argues that this "deliberate indifference" standard governs his claim. Assuming Plaintiff is correct, his claim still fails. As discussed above, Plaintiff's First and Fourth Amendment rights were not violated. Accordingly, Defendant Hall's actions could not have been taken with "deliberate indifference" towards those rights; therefore, Defendant Hall's actions were not "conscience-shocking," and Plaintiff's Fourteenth Amendment claim fails, insofar as it is based on Plaintiff's alleged seizure.

With respect to Plaintiff's right to refuse medical treatment, any potential claim would lie against Paramedic Bialk, the individual who provided the treatment. (*See* Defs.' Mot., Ex. 5 at ¶ 14 ("I made the decision to treat and transport Mr. Mills."); Ex. 6 at 29 ("I took the blood pressure. I started an I.V.").) Paramedic Bialk is not a defendant in this case.

In light of the above, Defendant Hall's motion for summary judgment is GRANTED with respect to Plaintiff's Fourteenth Amendment claim.

Because Plaintiff has failed to establish a constitutional violation, Defendant Hall's motion for summary judgment is GRANTED in its entirety. It is thus unnecessary for the Court to consider the second prong of the qualified immunity standard.

### B. Defendant City of Croswell

Plaintiff also seeks to hold the City of Croswell liable for his alleged constitutional injuries. Although "a municipality cannot be held liable under § 1983 on a respondeat superior theory," it may be sued directly under § 1983 if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officer" or if "constitutional deprivations [were] visited pursuant to governmental 'custom.'" *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

Before a municipality may be held liable under § 1983, then, a constitutional violation must have occurred. Indeed, the text of the statute itself limits its application to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Or as Plaintiff frames it, "[m]unicipal liability can be triggered by a single violation of federal rights." (Pl.'s Resp. at 17.) As discussed above, however, Plaintiff has failed to establish that any of his constitutional rights were violated. There is, accordingly, nothing for which the City can be held liable. The City's motion for summary judgment is therefore GRANTED in its entirety.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

s/Nancy G. Edmunds

20

Nancy G. Edmunds
United States District Judge

Dated:  June 10, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on June 10, 2008, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager